[Cite as *State v. Johnson*, 2023-Ohio-1367.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :
                                                No. 111618
    v.                           :

TANISHIA N. JOHNSON,                    :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN
PART AND REMANDED
**RELEASED AND JOURNALIZED:** April 27, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-655582-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and John F. Hirschauer, Assistant Prosecuting
Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Tanishia Johnson ("Johnson") appeals her
conviction and sentence for voluntary manslaughter from the Cuyahoga County
Court of Common Pleas. Johnson was found guilty of voluntary manslaughter,
involuntary manslaughter, reckless homicide and aggravated assault with firearm

specifications after a bench trial and was sentenced to a prison term of four years for voluntary manslaughter with a three-year term for the attached firearm specifications. The trial court noted that, pursuant to the Reagan Tokes sentencing provisions, the appellant could serve six years for the manslaughter conviction. She argues that the trial court's guilty verdicts were not supported by sufficient evidence and were against the manifest weight of the evidence, that one of the witnesses who testified during the state's case-in-chief was not competent to testify, that her trial counsel was ineffective and that the sentence imposed upon her was contrary to law.

{¶ 2} For the reasons that follow, we reverse the judgment, in part, based on a conceded error, vacate the voluntary-manslaughter sentence and remand for resentencing on the involuntary-manslaughter charge; we affirm the judgment in all other respects other than Johnson's argument about the Reagan Tokes Law which is now moot due to the fact that we are vacating the imposed sentence.

## I.    Factual Background and Procedural History

{¶ 3} On December 29, 2020, a Cuyahoga County Grand Jury indicted Johnson for murder pursuant to R.C. 2903.02(A) and 2903.02(B), felonious assault pursuant to R.C. 2903.11(A)(1), voluntary manslaughter pursuant to R.C. 2903.03(A) and reckless homicide in violation of R.C. 2903.041(A). Each count carried a one-year firearm specification under R.C. 2941.141(A) and a three-year firearm specification under R.C. 2941.145(A). The charges stem from the shooting death of Tommie R. Smith at Johnson's apartment on December 22, 2020. Smith was the father of Johnson's two daughters, T.J. and Ti.J., who were twelve and four

years old, respectively, in December 2020.  Both girls were at Johnson's apartment at the time of the shooting.

{¶ 4} It is undisputed that Johnson shot Smith in the chest that night, killing him and that Smith had brought the gun that killed him into the apartment.  The state's theory at trial was that Johnson purposefully killed Smith during the course of a heated argument.  The defense theory was that the shooting was a tragic accident that occurred as Smith, joking around, handed Johnson the gun after a night of drinking.

{¶ 5} A bench trial on the charges began on April 5, 2022.

**A. The State's Case**

{¶ 6} The state called 13 witnesses in its case-in-chief.

### 1. The Examination of Sadie Smith

{¶ 7} Sadie Smith testified that she is Tommie Smith's mother.  She testified to the following facts related to this case.

{¶ 8} Johnson and Tommie Smith dated romantically "on and off" for over a decade.  Johnson is the mother of Tommie's two children.  Tommie did not live with Johnson at the time of the shooting and had not done so for eight years.  But Tommie saw his daughters "[q]uite often," maybe four times a week.  Sadie saw Tommie and the girls around two times a month and they would shop, eat out and play at family-focused attractions.  It was Sadie's understanding that Tommie and Johnson were not romantically involved at the time of the shooting; they were "just parent, [and] coparent."  Tommie lived in Garfield Heights, Ohio and Johnson lived

in an apartment in the Trinity Towers apartment complex on Rockside Road in Bedford Heights, Ohio.

{¶ 9} Sadie dropped Tommie off at Johnson's apartment at approximately 2:30 p.m. on December 22, 2020. Sadie worked evenings at the time and Tommie planned to call her later in the evening to see when she thought she would get off work; they would decide at that time whether she would pick him up. Tommie did call Sadie at around 9:30 p.m. and sounded calm.

{¶ 10} Normally, on days that Tommie visited the girls at Johnson's apartment, Tommie would call her again around the time her shift ended at midnight and she would pick him up between 12:15 a.m. and 12:30 a.m. or they would meet along a bus line. On the night of December 22, 2020, though, Tommie did not call her again. Instead, she received a call from Hillcrest Hospital notifying her that her son was deceased.

{¶ 11} On cross-examination, Sadie testified that Tommie had a pattern in the steps he took to get ready to leave Johnson's apartment: "Make sure his shoes [are] on, grab his phone, put his coat on, and get ready to walk out the door." She said that if Tommie had his coat on, "he's about to leave to go home."

### 2. The Examination of Timothy Hensley

{¶ 12} Timothy Hensley testified that he is a sergeant of the City of Bedford Heights Police Department. He said he has been a police officer for 26 years and has served 24 years with the Bedford Heights police. He testified to the following facts related to this investigation.

{¶ 13} Hensley was the shift supervisor on December 22, 2020. The department received a 911 call that evening regarding a male with a gunshot wound in Johnson's apartment. The parties stipulated to the admission of the recording of the 911 call. Johnson can be heard screaming hysterically on the recording while trying to communicate with the 911 operator. Most of what she says during the call is unintelligible but the following phrases, among others, are captured: "I shot him," "I need help," "please don't die," "I shot my baby's father" and "oh my god."

{¶ 14} Every Bedford Heights officer that was on duty at the time responded to the call as did emergency medical services. All the responding officers arrived on scene at nearly the same time and Hensley was the second or third officer to enter Johnson's apartment. He immediately "observed a female partially seated on the couch and she was holding onto a male that was bleeding from his mouth and chest." The woman — Johnson — was seated on the edge of the couch and had her arms around the man — Smith — who was on the floor in front of her. Johnson was crying and "hysterical" and the man appeared to be unconscious. Hensley testified that another officer, Patrolman Chow, collected a firearm from the floor of the apartment.

{¶ 15} The officers attempted to render aid to Smith as they awaited emergency medical services. Officers "eventually had to contact an ambulance for" Johnson, too. A police officer transported the children from the apartment to the police station, where they were turned over to Johnson's mother.

{¶ 16} Officers found a single shell casing on the couch on which Johnson had been sitting when officers arrived. Officers identified marks consistent with a bullet strike on a ceiling and wall of the apartment; they found a set of bullet fragments near a leg of the apartment's kitchen table.

{¶ 17} On cross-examination, Hensley admitted that officers were not able to transport Johnson back to the station with her children "because she was so hysterical, and she eventually passed out." He said she was conscious and breathing but officers called an ambulance for her and she was taken to the hospital.

### 3. The Examination of Edward Greenwood

{¶ 18} Edward Greenwood ("Greenwood") testified that he lived in an apartment on the second floor of Johnson's apartment building in December 2020, nearby to Johnson's apartment. He testified to the following facts related to this case.[1]

---

[1] During Greenwood's testimony, he identified a written statement he gave detectives on December 24, 2020. The written statement was admitted into evidence but is not in the record on appeal. An inventory of the trial exhibits indicates that the statement is in the custody of the prosecutor's office, along with physical evidence including the gun and bullet fragments, certain records from the Cuyahoga County Division of Children and Family Services that were admitted at trial and the recording of the police interview with T.J. at the police station following the shooting (discussed further below). It is the appellant's duty to ensure the completeness of the record on appeal. *E.g., O'Donnell v. Northeast Ohio Neighborhood Health Servs.*, 8th Dist. Cuyahoga No. 108541, 2020-Ohio-1609, ¶ 75, fn. 6 ("The appellant has a duty to ensure that the record relating to his or her assignments of error is complete."); *Pietrangelo v. Hudson*, 2019-Ohio-1988, 136 N.E.3d 867, ¶ 22 (8th Dist.) ("It is the appellant's duty to ensure that [this court is provided] with all of the information needed to decide an assignment of error."). Accordingly, we must presume that these exhibits are consistent with the testimony describing the exhibits at trial.

{¶ 19} On the night of the shooting, Greenwood was watching a movie in the living room of his apartment. He heard yelling coming from an apartment he thought was next door to him, then a gunshot. The yelling "sounded like arguing" and was "brief," then he "heard the gunshot louder than anything else." He heard more yelling after the gunshot; specifically, he heard a female voice yelling and it "[s]ounded like she was scared."

{¶ 20} On cross-examination, Greenwood admitted that "[t]hey weren't arguing for long before the gun went off" and said, "When they were arguing that's when I heard the gunshot." Greenwood admitted that what he heard before the gunshot "wasn't nearly as loud as the screaming and hysteria" he heard after the gunshot and while the police were on the scene.

### 4. The Examination of T.J.

{¶ 21} T.J. testified that Tommie Smith is her father. She said that she is 14 years old and is currently living with her maternal grandmother and Ti.J. T.J. testified to the following facts related to this case.

{¶ 22} T.J. was living with Johnson and Ti.J. at Johnson's Trinity Towers apartment in December 2020. She had a good relationship with her father before his death and saw him frequently. Smith used to go over to Johnson's apartment frequently and they would spend time together at the apartment, watching sports and talking and they would go shopping, too.

{¶ 23} On cross-examination, T.J. testified that her parents had been together in a relationship for a long time and that she had an "awesome" relationship

with Johnson. Johnson provided a good place for the girls to live. She spent time with her parents together and also spent time with her dad alone. Smith liked to take Ti.J. shopping, too. They would also "sit and watch movies and talk." T.J. said her relationship with her dad was good around Christmas 2020.

{¶ 24} T.J. further testified under cross-examination that the relationship between Smith and Johnson was good in December 2020. She has seen her parents have "good times" and "bad times" in the past. She has seen them argue before; the arguments were only verbal, never physical, at least that she saw. On the morning of December 22, 2020, there were wrapped Christmas presents under the Christmas tree in her apartment. The family was planning to celebrate Christmas on December 25 at Johnson's mother's house; the plan was for Smith to also celebrate Christmas there.

{¶ 25} T.J. testified on direct that the plan for December 22, 2020 was for Smith to come over to the apartment, where they would hang out and watch the Los Angeles Lakers basketball game on television. Her father got to the apartment in the afternoon. They hung out for a little while and then Smith and Johnson walked to a store together before the game started to buy snacks. They returned with some fast food for dinner and candy for the girls.

{¶ 26} While the Lakers game was on television, Smith and Johnson were on the couch in the living room and T.J. and Ti.J. were in T.J.'s room. T.J. was using social media on her phone.

{¶ 27} There came a time that evening, while the basketball game was on, when T.J. heard her parents "talking loud." She said her parents were talking about "past relationships and past people that they were messing with at the time." T.J. went out into the living room when she heard them talking loudly. Her parents "were drinking" and one of them had spilled beer on the couch. T.J. got a towel and helped clean up the spill, then she went back to her room. She went back onto social media using her phone and then "heard a loud pop noise."

{¶ 28} The state inquired about her statement to law enforcement officers that her parents were "arguing" before she heard the gunshot. T.J. admitted that she previously said they were "arguing." But she testified that she did not know the difference between "arguing" and "talking loud." She reiterated that they were either arguing or talking loudly about "the past" before she heard the gunshot but she maintained that they had stopped arguing minutes before she heard the gunshot.

{¶ 29} On cross-examination, T.J. admitted that she went into the living room when she heard her parents talking loudly to see what they were talking about and "to see if everything was okay." She saw both of her parents sitting on the couch. Her parents quieted down when they saw her coming into the room from the hallway. Johnson helped T.J. clean up the spill; her parents were not arguing while they worked on the spill. T.J. went back into her room after cleaning up the spill, leaving her bedroom door partially open. Ti.J. had been in the room the whole time, using a tablet computer. T.J. did not hear her parents argue or talk loudly again while she was in her room after cleaning up the spill.

{¶ 30} T.J. testified on direct that she heard her mother screaming after the gunshot; she was screaming "[T.J.], call 911." T.J. called 911 and went to the living room to see what was happening. She saw "dad, and my mom had him in her arms." She saw that Smith was "bleeding rapidly," so she gave Johnson a towel and Johnson held the towel against Smith's chest. T.J. saw Smith bleeding from his mouth. She gave the phone to Johnson so that Johnson could speak to the 911 operator. T.J. then went to her room and was "flipping out." T.J. told Ti.J. to stay in the bedroom. T.J. then went to the front door to go to a neighbor's apartment to get more help and the police were at the door by the time she opened it.

{¶ 31} After police arrived, T.J. was collecting belongings for Ti.J. when she saw Johnson "pass out because she was having a panic attack." Police transported T.J. and Ti.J. to the police station. Johnson was still screaming as they left for the station. T.J. eventually spoke with a detective about what happened.

{¶ 32} On cross-examination, T.J. admitted that Johnson immediately asked her to call 911 after T.J. heard the gunshot. She said her mother used the towel to try to help Smith and her mother was crying and screaming. T.J. admitted that she had never seen Johnson hold a gun and never knew her to own a gun.

{¶ 33} On redirect, the state again sought to clarify aspects of T.J.'s testimony; the point of contention was whether there was a break, lasting several minutes, between when T.J. heard her parents arguing and the gunshot. The state

played a video recording of an interview that law enforcement conducted with T.J.[2]

T.J. related that this interview took place several hours after the shooting in the hours as the night of December 22, 2020 turned into the morning of December 23. After playing the recording, the prosecutor examined T.J. as follows:

> [PROSECUTOR]: Did you remember saying that all you heard was arguing and stuff and it just happened?
>
> [T.J.]: Yes.
>
> [PROSECUTOR]: That's what you told the detective?
>
> [T.J.]: Yes.
>
> [PROSECUTOR]: Is that what happened, they were arguing and then it just happened?
>
> [T.J.]: No.
>
> * * *
>
> [PROSECUTOR]: Do you remember telling the detective that you couldn't hear what they were arguing about, they were arguing and then there was a loud boom?
>
> [T.J.]: Yes.
>
> [PROSECUTOR]: You told the detective that that night, correct?
>
> [T.J.]: Yes.
>
> [PROSECUTOR]: And now you're giving us a different story?
>
> [T.J.]: Yeah. Because I could think better. That night I couldn't think that much because it just happened.

---

[2] As discussed above at footnote 1, this recording is not in the record on appeal and we, therefore, presume the recording is consistent with the testimony describing it.

{¶ 34} T.J. further admitted on redirect that she cares about her mother and does not want to see her get in any trouble. T.J. admitted that she has spoken with Johnson a lot since the shooting and that Johnson has talked to her about "what could happen here today." T.J. admitted that she knows her mother will face "some penalties" if she were to be convicted but she said that her testimony in court was the truth.

{¶ 35} On recross, T.J. admitted that Johnson never told her to lie in court. She said the detective, during the interview that was the subject of the recording, did not go through the day of the shooting in as much detail as defense counsel had done in court. T.J. admitted that, in the recorded interview, she had heard herself say that she "just can't think right now" in response to a question about her address. T.J. said that she would not come into court and lie for her mother, even though she loves her mother. T.J. said, "There's nothing to lie about."

### 5. The Voir Dire and Examination of Ti.J.

{¶ 36} The trial court, prosecution and defense conducted a voir dire of Ti.J. Ti.J. said she was six years old and identified where she went to school. The voir dire then proceeded as follows:

THE COURT: What grade are you in? You in the eighth grade?

[Ti.J.]: No. First grade.

THE COURT: You like first grade?

[Ti.J.]: Yeah.

THE COURT: And you know you're here to answer some questions today just like I'm asking? Can you keep doing that?

[Ti.J.]: Yeah.

THE COURT: You ever go to church?

[Ti.J.]: No.

THE COURT: You don't go to church?

[Ti.J.]: No.

THE COURT: You know what it is to tell the truth?

[Ti.J.]: No.

THE COURT: No?

[Ti.J.]: I never went there.

THE COURT: I understand that part. Do you know when somebody asks you a question they want you to tell the truth, right? Can you do that? You got to answer out loud yes or no.

[Ti.J.]: Yes.

THE COURT: Do you know what happens if you don't tell the truth? What happens?

[Ti.J.]: I don't know.

THE COURT: You don't know. Okay. You know what it is to tell a lie?

[Ti.J.]: Yes.

THE COURT: What is that?

[Ti.J.]: When you tell a lie everybody thinks you're not really telling the truth.

THE COURT: Well, that's the truth. That's the truth, you're correct there. Now, are you here to tell the truth or are you here to tell lies today?

[Ti.J.]: Here to tell the truth.

* * *

[PROSECUTOR]: * * * So if I were to tell you that today is Christmas, would that be the truth or a lie?

[Ti.J.]: A lie.

[PROSECUTOR]: Very good. If I were to tell you today's your birthday, would that be the truth or a lie?

[Ti.J.]: A lie.

[PROSECUTOR]: If I were to tell you that the lights in this room are off, would that be the truth or a lie?

[Ti.J.]: A lie.

[PROSECUTOR]: Okay. Do you know whether it's right or wrong to tell a lie?

[Ti.J.]: Wrong.

[PROSECUTOR]: If I were to tell you that you're sitting in a chair right now, is that a truth or a lie?

[Ti.J.]: Truth.

[PROSECUTOR]: If I were to tell you that you're talking into a microphone right now, is that the truth or a lie?

[Ti.J.]: Truth.

[PROSECUTOR]: So when the judge is going to ask you if you can tell the truth when we ask you some questions about things that happened before, can you do that for us?

[Ti.J.]: Yeah.

* * *

 [DEFENSE COUNSEL]: * * * Do you know what month your birthday is?

[Ti.J.]: Yes.

[DEFENSE COUNSEL]: You know what I'm talking about, what month?

[Ti.J.]:  No.

[DEFENSE COUNSEL]:  Okay.  January is a month, right?

[Ti.J.]:  Uh-huh.

[THE COURT]:  You have to say yes when you mean yes or no when you mean no.  * * * So you know when Christmas is?

[Ti.J.]:  When?

[THE COURT]:  Do you know what month Christmas is?

[Ti.J.]:  Yes.

[THE COURT]:  What month?

[Ti.J.]:  April.

[THE COURT]:  Okay.  We're in April right now, or April is when Christmas is?

[Ti.J.]:  April right now.

* * *

[DEFENSE COUNSEL]:  * * * Do you remember your last birthday?

[Ti.J.]:  Yes.

[DEFENSE COUNSEL]:  That's when you turned six, right?

[Ti.J.]:  Yes.

[DEFENSE COUNSEL]:  Do you remember did you get presents?

[Ti.J.]:  Yes.

[DEFENSE COUNSEL]:  Do you remember what you got?

[Ti.J.]:  Yes.

[DEFENSE COUNSEL]:  What did you get?

[Ti.J.]:  I got a doll and a game.

[DEFENSE COUNSEL]: Okay. From whom?

[Ti.J.]: I got the doll from mommy, and I got a game from my grammy.

[DEFENSE COUNSEL]: Okay. Do you remember what you had for breakfast today?

[Ti.J.]: Yes.

[DEFENSE COUNSEL]: Okay. What did you have?

[Ti.J.]: Cereal.

[DEFENSE COUNSEL]: What kind?

[Ti.J.]: Crispy.

[DEFENSE COUNSEL]: Rice Crispy?

[Ti.J.]: Uh-huh.

[DEFENSE COUNSEL]: Yes?

[Ti.J.]: Yes.

[DEFENSE COUNSEL]: Do you know your teachers?

[Ti.J.]: Uh-huh.

[DEFENSE COUNSEL]: What grade are you in?

[Ti.J.]: First grade.

* * *

[THE COURT]: Do you think you can answer the questions from these two men and tell the truth to each one of their questions?

[Ti.J.]: Yeah.

[THE COURT]: You promise me you'll do that?

[Ti.J.]: Yes.

[THE COURT]: If they ask a question and you don't understand it, will you say I don't understand the question?

[Ti.J.]: Yes.

[THE COURT]: And do you promise not to say uh-huh?

[Ti.J.]: No.

[THE COURT]: She's probably being honest there. You have to say yes or no. Okay? Is that a deal?

[Ti.J.]: Yes.

{¶ 37} Based on this voir dire, the trial court found that Ti.J. was capable of understanding the duty to tell the truth and was qualified as a witness under Evid.R. 601. Neither party objected to this finding. Ti.J. then testified to the following facts related to the case.

{¶ 38} On the day of the shooting, Ti.J. heard her parents arguing in the living room; they were talking loudly enough that she heard them from T.J.'s room while she was watching television on a tablet computer. Ti.J. described her understanding that arguing "means we get real frustrated, you start to argue at people." She said she did not know what her parents were arguing about, but she described the following:

[Ti.J.]: She got mad because my dad was acting silly to her.

[PROSECUTOR]: Okay. Can you describe what you mean — Can you tell us what you mean when you say he was acting silly?

[Ti.J.]: He was talking bull crap.

[PROSECUTOR]: Do you know what he was talking about?

[Ti.J.]: No.

{¶ 39} Ti.J. said she remembered that "mommy spilled some juice and my sister helped wipe it up off the couch." She remembered that she was in the bedroom

when she heard her parents arguing and then she heard "[l]ike a gunshot or something."  She continued as follows:

> [PROSECUTOR]:  And when did that happen in comparison to the argument?
>
> [Ti.J.]:  I don't know.
>
> * * *
>
> [PROSECUTOR]:  * * * How much time was it in comparison to the arguing to the gunshot?
>
> [Ti.J.]:  Five minutes.
>
> [PROSECUTOR]:  Okay.  Do you know how long five minutes is?
>
> [Ti.J.]:  Yes.
>
> [PROSECUTOR]:  * * * Is it a short period of time or a long period of time?
>
> [Ti.J.]:  A long period of time.

{¶ 40} On cross-examination, defense counsel asked Ti.J. to estimate how long it had been since he had last asked her questions (during her voir dire).  While the timestamps on the trial transcript indicate that approximately ten minutes had passed, Ti.J. answered, "Five minutes."  Ti.J. further admitted that she had been "having a good day" when Smith came over to Johnson's apartment.  She said it was around Christmastime and there were presents under the Christmas tree.

### 6.  The Examination of Phillip Chow

{¶ 41} Phillip Chow testified that he has been a police officer with the City of Bedford Heights Police Department for 23 years.  He testified to the following facts related to this investigation.

{¶ 42} Patrolman Chow was working on the night of December 22, 2020 and responded to an emergency call at Trinity Towers. As he and other responding officers approached the apartment, they could hear a woman screaming. As he entered the apartment, he saw two people at the front of a couch and a gun on the floor between the couch and the doorway. The people were "within reaching distance" of the gun. Chow picked up the gun — a semiautomatic Ruger P95 Decocker capable of firing 9 mm bullets — "decocked" it and put it in his pocket. He said he and the other officers then "rendered aid to a male." Chow test-fired the Ruger some time later and found it to be operable.

{¶ 43} Chow accompanied Johnson to the hospital on the night of the shooting. She "was still screaming and crying" even as medical staff were trying to treat her.

### 7. The Examination of Dontai Edmondson

{¶ 44} Dontai Edmonson testified that he has been a police officer with the Bedford Heights Police Department for two and a half years and served as a police officer for approximately two years with the Cleveland Police Department before being hired by Bedford Heights. He testified to the following facts related to this investigation.

{¶ 45} Edmonson was working on the night of December 22, 2020 and responded to Trinity Towers on an emergency call for a male shot. When he arrived, he "noticed a female holding a male." The female — Johnson — "was hysterical saying he's shot, please save him, I shot him."

{¶ 46} Edmonson was wearing a body-worn camera when he responded to the call. He identified two video recordings as those made by his body-worn camera on the night of the shooting. The state played the recordings in court. Edmonson identified that the recordings are timestamped and that the first begins at 11:16 p.m. on December 22, 2020.

{¶ 47} Edmonson described the video recording as it was played. Edmonson entered the apartment and saw a woman sitting on the couch holding a male, who was on the floor laying between her legs. Edmonson identified that the man — Smith — had a gunshot wound to his chest "near his heart area." He said Smith was "limp"; he could not identify whether Smith had a pulse. Edmonson asked Smith to squeeze his hand but he did not feel any response. Edmonson noticed that the man was wearing a winter coat, a shirt and blue jeans.

{¶ 48} Johnson was taken into a hallway, where police asked her what happened. Edmonson testified as follows:

> [Johnson] said we was in the house or were having a conversation. He pulled out the gun. He said yeah, something something, you're not going to do something something, and I pulled the trigger.[3]

{¶ 49} Edmonson identified that Johnson said they were talking and drinking and "having a good time." He identified that she repeated that Smith pulled the gun out and said "[Y]eah, whatever whatever[;] * * * [h]e's like you're not

---

[3] The video recording is materially consistent with Edmonson's testimony. For clarity, Edmonson does not use the words "something something" because he cannot understand what Johnson is saying; he is quoting Johnson directly.

going to" and then "she kind of stumbled over her words." In the recording, Johnson clearly says, "He pulled the gun out and I pulled the trigger"; she said she had the gun in her hand.

{¶ 50} Edmonson then went back into the apartment and checked one of the rooms, looking for Johnson's children. After reviewing the video recording, Edmonson identified that, when he found T.J. and Ti.J. in a bedroom, Ti.J. said:

> [M]y mom was really angry, and that made her really hyper, and * * *
> then my dad died.[4]

{¶ 51} Edmonson took T.J. and Ti.J. from the apartment to the police station in his patrol car. After dropping them off, he went to the hospital to speak with Johnson who had been taken to the hospital by ambulance.

{¶ 52} On cross-examination, Edmonson testified that he entered the apartment to find Johnson hysterical and holding Smith "like in an embrace." He related that he remembered, and saw on the body-worn camera footage, that she said things along the lines of "please save him, oh, God, oh, God, I need my mother, please save him."[5] He admitted that Johnson never said they had been fighting or that he had hit her or was attacking her. He admitted that she said they were hanging out, having a good time and drinking and then Smith handed her the gun.

---

[4] The recording is materially consistent with Edmonson's testimony. Ti.J. also used the word "fighting" in the recording, though the context is not perfectly clear.

[5] The recording is consistent with this testimony. Johnson repeatedly pleads with emergency personnel to "save" Smith, repeatedly asks whether he is going to live and expresses alarm that he was not breathing when medical personnel took him from the apartment.

He admitted that he heard Johnson say, "I need my mommy, I shot T on accident." He admitted that she said it was an accident "in real time," before she was taken to the hospital. The state stipulated that Johnson said it was an accident for a second time, as captured in the recording, before she was taken to the hospital.[6]

{¶ 53} On direct-examination, Edmonson identified a second video recording as that from his body-worn camera of an interview he conducted with Johnson at the hospital. He identified that the recording bears a timestamp of 5:05 a.m. on December 23, 2020. He said Johnson appeared to be calmer than she was several hours prior. The state played the recording. As the recording played, Edmonson identified Johnson saying, "We was sitting at the house and we was drinking." He continued as follows:

> [EDMONSON:] * * * She said he went to the closet, pulled out the gun, when he pulled out the gun I don't know if he was trying to be funny. * * * She said when he handed it to her she guessed she grabbed it wrong and she didn't expect it to go off. * * * I asked her why did he hand it to her. She said it was in the closet the whole time because the kids were there.
>
> [PROSECUTOR]: Did she answer the question as to why he handed it to her?
>
> [EDMONSON]: No.
>
> [PROSECUTOR]: Can you make out what she said there?
>
> [EDMONSON]: I asked her what made him grab the gun. She said I don't really know for real, for real. * * * She said when he handed it to me I didn't expect it to go off like that. * * * She said she had it in her hands and she wasn't expecting it to go off. * * * She said she didn't

---

[6] Again, the recording is consistent with this testimony and the state's stipulation.

think it was loaded for real. * * * She [said she] grabbed it and it was an accident.[7]

**{¶ 54}** On cross-examination, Edmonson admitted that he did not recall whether medical staff advised him about any kind of medications they may have given Johnson before his interview with her at the hospital on the morning of December 23.

**{¶ 55}** Edmonson said it was his belief, while rendering aid to Smith in Johnson's apartment, that Smith had already passed away. His belief was based on "the way his body was and the circumstances of what was going on." He did not receive confirmation that Smith had died until sometime after he interviewed Johnson at the hospital.

### 8. The Examination of Lisa Przepyszny

**{¶ 56}** Lisa Przepyszny testified that she is employed as a forensic scientist in the Trace Evidence Department at the Cuyahoga County Regional Forensic Science Laboratory, part of the Cuyahoga County Medical Examiner's Office. She said she has been a forensic scientist at the medical examiner's office for almost 18 years. The state offered Przepyszny as an expert in making muzzle-to-target-distance determinations and the defense did not object to her qualifications; the court found her qualified to give expert testimony. She testified to the following facts and opinions related to this investigation.

---

[7] The recording is materially consistent with this testimony. Johnson additionally said, "It happened so fast." She also asked Edmonson whether Smith was okay.

{¶ 57} Smith was pronounced dead, at the hospital, at 11:48 p.m. on December 22, 2020. Smith's body was received by the medical examiner's office on December 23, 2020. Przepyszny thereafter examined Smith's body and the physical evidence received by the medical examiner's office and performed a muzzle-to-target-distance examination.

{¶ 58} She opined that her examination and forensic testing — which included visual and chemical tests for gunshot residue and a comparison of residue patterns observed on targets after test-firing the handgun involved in the shooting from various distances — revealed that the gun had been more than one inch and less than nine inches away from Smith's chest when it was fired.

{¶ 59} Przepyszny testified that there was blood on Smith's blue winter coat, a long-sleeved shirt Smith had been wearing under the coat and a black t-shirt Smith had been wearing under the long-sleeved shirt. She said she concluded that Smith was wearing his winter coat partially or fully unzipped when he was shot, because there was no entrance bullet hole in the coat but there were bullet holes and gunshot residues observed on the long-sleeved shirt. She said there was an exit bullet hole in the coat.

### 9. The Examination of Andrea McCollom

{¶ 60} Andrea McCollom testified that she is a medical doctor and a Deputy Medical Examiner at the Cuyahoga County Medical Examiner's Office. She said she has been with the medical examiner's office for 23 years. The defense stipulated to

her qualifications. She testified to the following facts and opinions related to this investigation.

{¶ 61} Smith was pronounced dead "a minute after he arrived" at the hospital. Dr. McCollom performed the autopsy. Smith died from a single gunshot wound that caused "vascular, visceral, and skeletal injuries." She described that the bullet entered Smith's chest and passed through his heart and lung before exiting his back. She said the injury to Smith's heart would be "very hard to fix."

{¶ 62} Toxicology testing showed that Smith's blood alcohol concentration was 0.181 grams per deciliter. Dr. McCollom estimated that Smith drank seven to eight "alcohol equivalents," "like seven to eight shots or cans of beer" before he was killed. She said that at that level of intoxication, Smith would have been conscious but "would have a lot of problems with coordination and judgment."

{¶ 63} There was no soot on Smith's skin from burned gunpowder but there were "some very faint abrasions" near the entrance wound in Smith's chest that Dr. McCollom thought may be stippling, which she described as abrasions caused by unburned gunpowder that struck Smith's skin as he was shot. Based on the stippling, she said she would expect that the gun was closer than one to three feet from Smith when it was fired. But she deferred to the Trace Evidence Department on the muzzle-to-target distance determination.

### 10. The Examination of James E. Kooser

{¶ 64} James Kooser testified that he is employed as a Forensic Scientist II Firearms and Tool Mark Examiner at the Cuyahoga County Regional Forensic

Science Laboratory. He said he has been a firearms and tool mark examiner for almost six years and was a police detective for seven and a half years before that. The state offered Kooser as an expert in firearms and tool mark examination and the defense did not object. The court accepted him as an expert witness. He testified to the following facts and opinions related to this investigation.

{¶ 65} Kooser examined the Ruger handgun involved in the shooting and found that it "functions as it was manufactured." He said there is no way that the gun could have fired unless the trigger was pulled. He said the gun would have a lighter trigger pull in single action, meaning it would be "easier to fire," but there is no way for him to determine whether the gun was single-action or double-action when it fired the bullet that killed Smith.

{¶ 66} On cross-examination, Kooser admitted that the handgun does not have a trigger safety.

### 11. The Examination of Angela Curtis

{¶ 67} Angela Curtis testified that she is employed as an intake short-term social worker with the Cuyahoga County Division of Children and Family Services ("CCDCFS"). She said she has been with CCDCFS for 25 years. She testified to the following facts related to this case.

{¶ 68} Curtis received an emergency referral on December 23, 2020, related to T.J. and Ti.J. Initially, the information reported to the CCDCFS was "that the mother and father were drinking, they were playing with a gun, and the gun discharged and the mother shot the father and he was deceased * * *." Curtis went

to the Bedford Heights Police Department and learned that law enforcement had interviewed the children and then released them to their maternal grandmother. She met with the children at the maternal grandmother's house on the afternoon of December 23, 2020 for the purpose of making sure the children were safe and that an appropriate caregiver was looking after their needs. Curtis said she was not able to interview Ti.J. that day because she "was pretty guarded and nervous" and "was not very talkative." Curtis testified that she spoke with T.J. about the circumstances of her father's death.[8]

{¶ 69} Curtis testified that she met with the children again on December 28, 2020, and found them to be "happy and well adjusted with grandmother." She said that their grandmother was meeting all of the children's needs.

### 12. The Examination of Holly Mack

{¶ 70} Holly Mack testified that she is employed by CCDCFS as "[t]he child advocate in the county jail." She said that she works with parents who are in the jail. Mack said she interviewed Johnson through videoconferencing software on January 5, 2021 for the primary purpose of making sure T.J. and Ti.J. were safe. Mack related that the conversation went as follows:

> She had told me herself and Mr. Smith had come home. They had been shopping. She poured them both a drink and he had pulled out a gun and was going to place it on the table. She had told him she wasn't comfortable with the gun being out where the children could see it or get a hold of it, asked if she could put it away. He had agreed and handed her the gun. With her hand she grabbed the handle. So he

---

[8] The trial court sustained an objection when the prosecution sought to elicit the details of this conversation.

handed it to her with the handle facing her so she grabbed the handle, and she said as soon as she grabbed the handle the gun went off and he was hit. * * *

She said when the gun went off the girls must have heard it and they both came running into the room. She instructed them to go back into the other room and told [T.J.] to call 911.

{¶ 71} Mack testified that Johnson told her she did not pull the trigger. Mack said Johnson did not mention anything about Johnson and Smith arguing or fighting before the shooting. Mack said Johnson denied that she and Smith were intoxicated at the time of the shooting.

{¶ 72} On cross-examination, Mack admitted that Johnson also told her during this interview that she loved Smith and that they had been together over 17 years. Mack said Johnson told her that "if [Smith] doesn't live that she didn't want to live" either.

### 13. The Examination of Ericka Payne

{¶ 73} Ericka Payne testified that she is employed as a detective with the Bedford Heights Police Department. She said she has been a police officer for 19 years. She testified to the following facts related to this investigation.

{¶ 74} Payne was assigned to this investigation on December 22, 2020. She reported to the police station, finding T.J. and Ti.J. already there. The girls' maternal grandmother arrived and gave her permission to speak with T.J. about the

shooting. Payne identified and authenticated a video recording of her interview with T.J.[9] She related that T.J. told her the following:

> She indicated she was in her back bedroom on the phone and she heard some arguing and heard a large boom. She ran in. Her mom called to assist her and she came in, called 911, and got a towel to apply pressure to her dad until police arrived.

{¶ 75} Payne said that T.J. did not say "there was any space in between the arguing and the loud boom." She said T.J. did not "mention anything about [a] spilled drink and all this and about coming in the room during the argument, the argument stopping, leaving the room, then hearing the loud boom." But she agreed that the interview was "fairly brief" and said she "didn't want to go too deep with [T.J.]" in that interview "because she just experienced something traumatic."

{¶ 76} On cross-examination, Payne admitted that no police officer interviewed T.J. after her initial interview. She admitted that T.J. provided more details during trial about what happened that evening than T.J. gave in her interview. But she said T.J.'s testimony was consistent with her interview statement in that "there was an argument and she heard the shot fired and she came out and her father had been shot."

{¶ 77} On direct, Payne testified that she called the hospital on the night of the shooting to inquire about Johnson; the hospital told her that Johnson had been sedated. Payne interviewed Johnson at the hospital on the morning following the shooting. Payne identified and authenticated a video recording of that interview.

---

9 This video recording is not in the record on appeal; see above at paragraphs 1–2.

{¶ 78} Payne related that Johnson said the following during the interview:

> She said they were hanging out, just drinking or whatever, for whatever reason he went to the closet and pulled the gun out. He was just trying to show it or something.[10]

{¶ 79} In the recording, Johnson said that Smith put the gun in her hand "and that's when I hit accidentally * * *," trailing off. She denied that she and Smith were fighting. She said she thought the gun was not loaded when Smith gave it to her.

{¶ 80} On direct-examination, as the recording of her interview continued playing, Payne testified that she had asked Johnson how she and Smith were positioned in the apartment when the gun went off. Johnson asked Payne to step backward a little, such that Payne estimated she was four feet from Johnson. In the recording, Johnson confirmed that distance and said "and then he had — he pulled it out" and was "showing it off pretty much." She said she had then said something like, "Oh, let me see." Then, she said, the gun went off. The recording captures Payne ask if either Smith or Johnson was intoxicated; Johnson nodded and responded, "Uh-huh, we probably was a little buzzed * * *."

{¶ 81} Payne testified that she reviewed the body-camera recordings from the responding officers. On cross-examination, Payne admitted that Johnson appears "absolutely hysterical" for a "significant duration of time" in the footage. Payne admitted that Johnson yelled for her children to come help and call 911

---

[10] The recording is consistent with this testimony.

immediately after the gun went off. She admitted that, in all the law-enforcement recordings, Johnson repeatedly told officers that they "were drinking" and "having a good time." Payne admitted that Johnson also consistently said that Smith pulled out the gun and that she was uncomfortable with the gun being out because of her kids. She admitted that Johnson also consistently described that Smith had put the gun in the closet and then got it again as he was leaving. She admitted that Johnson consistently said that Smith pulled out the gun and started "messing with it or playing with it."

{¶ 82} Payne further admitted that it is possible for a person to pull the trigger of a gun on accident. Payne further admitted as follows:

> [DEFENSE COUNSEL]: Okay. You would also agree with me after reviewing all these body cams and everything else that what is her like biggest concern once he leaves — while the first responders are there, what is her primary concern?
>
> [DETECTIVE PAYNE]: Him.
>
> [DEFENSE COUNSEL]: Right. What does she say over and over and over and over again?
>
> [DETECTIVE PAYNE]: She wants to know his condition.
>
> [DEFENSE COUNSEL]: Before that. Doesn't she say please, God, save him, please save him, do something, save him, right?
>
> [DETECTIVE PAYNE]: Yeah.
>
> [DEFENSE COUNSEL]: * * * She's almost demanding the safety personnel and first responders to save his life, right?
>
> [DETECTIVE PAYNE]: Yes.

{¶ 83} On redirect, Detective Payne testified that she believes Johnson "regrets what she did." But she said regret does not "change what happened in that moment."

{¶ 84} Payne stated that she reviewed previous calls for law-enforcement service related to Johnson and Smith and saw "multiple calls of a contentious relationship." She said there had been calls from "both parties." In the recording of Payne's interview with Johnson, Payne asked Johnson if their history had played into what happened that night. Johnson admitted that they had been together 17 years and "it wasn't ever perfect" and they had their "ups and downs," but said "that night we was just chilling and just drinking and just trying to have a good time."

{¶ 85} Payne contacted the last registered owner of the gun involved in the shooting and determined that the gun had been stolen.

{¶ 86} Payne testified that Johnson was the only witness police interviewed who did not report that there had been an argument prior to the shooting.

{¶ 87} The state stipulated that Johnson had a blood alcohol concentration of around 0.2 at the time of the shooting.

{¶ 88} After Payne's testimony, the state offered its exhibits into evidence without any defense objection and then rested its case.

## B. The Motion for Acquittal and the Defense Case

{¶ 89} After the close of the state's case, Johnson moved for acquittal on all the charges pursuant to Crim.R. 29. The trial court denied the motion.

{¶ 90} The defense presented one witness in its case, Angela Johnson.

{¶ 91} Angela Johnson testified that she is Johnson's mother. She testified that Johnson and Smith had been in a relationship for 17 years and had two children together — T.J. and Ti.J. — who were 12 and 4 years old, respectively, in December 2020. Angela testified that she has never allowed T.J. or Ti.J. to speak to Johnson since the children were entrusted into her custody, in compliance with a court order. She said T.J. sometimes "talks to her mother through me," meaning that she will tell the kids when Johnson calls her and asks her to tell the kids she loves them, and vice versa. Other than that, she has not delivered messages back and forth. She said she has made the children available to both the prosecution and defense when requested.

{¶ 92} The defense rested after this testimony and renewed its Crim.R. 29 motion for acquittal which the trial court again denied.

{¶ 93} The trial court then heard closing arguments and took the matter under consideration.

### C. The Verdict

{¶ 94} The trial court acquitted Johnson of purposeful murder in violation of R.C. 2903.02(A). In announcing that verdict, the court stated its finding that Johnson did not act purposefully; it said this finding "may be the easiest decision I had to make in this case."

{¶ 95} The court acquitted Johnson of felony murder in violation of R.C. 2903.02(B) but found her guilty of the lesser included offense of involuntary manslaughter in violation of R.C. 2903.04(A).[11]

{¶ 96} The court acquitted Johnson of felonious assault in violation of R.C. 2903.11(A)(1) but found her guilty of the lesser included offense of aggravated assault in violation of R.C. 2903.12(A)(1).

{¶ 97} The court found Johnson guilty of voluntary manslaughter in violation of R.C. 2903.03(A) and reckless homicide in violation of R.C. 2903.041(A), as charged.

{¶ 98} The court found Johnson guilty of each of the one- and three-year firearm specifications attached to the counts under R.C. 2941.141(A) and 2941.145(A).

**D. The Sentence and Appeal**

{¶ 99} The trial court held a sentencing hearing on May 12, 2022.

{¶ 100} The state stipulated that all the counts of conviction merged. The court and the prosecution then had the following exchange:

---

[11] The trial court misspoke when announcing its verdict on Count 2 at the hearing; it stated that it "finds the defendant guilty of the lesser but included offense of aggravated assault in violation of 2903.04(A)." The record makes clear that the trial court found Johnson guilty of involuntary manslaughter with respect to Count 2, not aggravated assault. The trial court found her guilty under R.C. 2903.04(A), the involuntary-manslaughter statute. Further, the trial court stated in its journal entry that it had found Johnson guilty of first-degree involuntary manslaughter, the lesser included offense under Count 2. A conviction for involuntary manslaughter is reflected in the presentence-investigation report and the mitigation-of-penalty report. The trial court referred to this conviction as a first-degree involuntary-manslaughter conviction at the sentencing hearing without any party objecting.

THE COURT: Which one would you move forward on?

[PROSECUTOR]: On the involuntary manslaughter, Judge.

THE COURT: Involuntary?

[PROSECUTOR]: Yes.

{¶ 101} The state addressed the court and read a victim-impact statement into the record. The defense addressed the court, as did Johnson. Johnson apologized to Smith's family and repeated that the shooting was an accident. She said she did not want to hurt her children and said that if she could "take this back," she would.

{¶ 102} The trial court sentenced Johnson to an indefinite sentence of between four and six years in prison on Count 4 — voluntary manslaughter — with three years for the firearm specification to be served prior to and consecutive to the underlying sentence. In announcing its sentence, the court stated as follows:

> There is a range of sentences, actually, that were provided in the indictment for the Court. And not that I went up and down, but I thought that the best one that fit is the one which the State is moving sentence forward with, and that is voluntary manslaughter.

{¶ 103} The defense objected to the imposition of an indefinite sentence under the Reagan Tokes Law.

{¶ 104} The trial court published a sentencing journal entry which stated, in relevant part:

> The court imposes a prison sentence at the Ohio Reformatory for Women of 7 year(s).
>
> For sentencing purposes, all counts merge. The state elects to sentence as to Count 4 [voluntary manslaughter].

Defendant sentenced to the aggregate minimum sentence of four years and a maximum sentence of six years. The three-year gun specification to be served prior to and consecutive to underlying sentence.

{¶ 105} Johnson appealed, raising the following five assignments of error:

Assignment of Error 1:

The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

Assignment of Error 2:

Appellant's convictions are against the manifest weight of the evidence.

Assignment of Error 3:

The trial court erred by finding [Appellant's] younger daughter competent to testify pursuant to Evid.R. 601 which resulted in plain error and violated Appellant's Sixth Amendment right when counsel did not object to the finding.

Assignment of Error 4:

The trial court erred by imposing an indefinite sentence pursuant to the Reagan Tokes Act because it is unconstitutional.

Assignment of Error 5:

Appellant's sentence is contrary to law.

## II. Law and Analysis

{¶ 106} We address Johnson's assignments of error in a different order than presented, starting with the alleged errors in the trial court's imposition of sentence.

### A. Fourth and Fifth Assignments of Error — The Sentence

{¶ 107} In her fifth assignment of error, Johnson contends that the trial court made procedural and substantive errors in imposing its sentence. In her

fourth assignment of error, Johnson contends that the trial court erred in sentencing her to an indefinite sentence under the Reagan Tokes Law.

{¶ 108} We review felony sentences under the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22–23. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce or otherwise modify a sentence or vacate a sentence and remand for resentencing if it "clearly and convincingly" finds that (1) the record does not support particular findings the sentencing court made or (2) the sentence is "otherwise contrary to law." "'Clear and convincing evidence is that measure or degree of proof * * * which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *State v. Franklin*, 8th Dist. Cuyahoga No. 107482, 2019-Ohio-3760, ¶ 29, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 109} Johnson argues that the trial court made a procedural error in sentencing her on the voluntary-manslaughter charge because the state had elected to proceed to sentencing on the involuntary-manslaughter charge. Johnson asks that we vacate her sentence and remand this matter for resentencing on the involuntary-manslaughter charge.

{¶ 110} The state concedes the error and agrees that the error should be corrected. We find that the error is supported by the record.

{¶ 111} The Ohio Supreme Court has said the following:

> When confronted with allied offenses, courts must be guided by two principles: that R.C. 2941.25(A) prohibits "convictions" for allied offenses and that the state controls which of the two allied offenses the defendant will be sentenced on. When the state elects which of the two allied offenses to seek sentencing for, the court must accept the state's choice and merge the crimes into a single conviction for sentencing * * *.

*State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 23–24.

{¶ 112} Here, the state elected to seek sentencing for involuntary manslaughter. Thus, the trial court was required to accept that choice, merge the offenses into a single conviction for involuntary manslaughter and then impose a sentence for that conviction. *Id.* at ¶ 24. The trial court instead proceeded to impose sentence on the voluntary-manslaughter charge. Unfortunately, no party objected, or raised the error, at the sentencing hearing to allow the trial court to correct itself. Nevertheless, the state concedes the error on appeal and the error is supported by the record. The state further concedes that we should remand this matter for resentencing to correct the error. Therefore, we will do so. *See State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 14 ("A sentence that contains an allied-offenses error is contrary to law. * * * Thus, the Eighth District had the authority to vacate [the defendant's] sentences that were affected by the allied-offenses error and remand the matter for a new sentencing hearing."). The guilty verdicts underlying Johnson's sentences "remain the law of the case and are not subject to review" on remand. *Id.* at ¶ 15.

{¶ 113} Johnson also argues that there was a substantive error in the imposition of the sentence; she says the sentence was more than the minimum

necessary to accomplish the purposes of felony sentencing in light of the mitigation evidence presented. This argument is moot because we are vacating the conviction for the conceded procedural error and remanding for resentencing. Johnson's fourth assignment of error — addressing the indefinite sentence imposed under the Reagan Tokes Law — is similarly moot.

{¶ 114} We sustain Johnson's fifth assignment of error in part, vacate her sentence for voluntary manslaughter and remand this matter for resentencing on the involuntary-manslaughter conviction. On remand, the trial court "must accept the state's selection, merge the offenses accordingly for the purposes of sentencing, and impose a sentence that is appropriate for the remaining offense * * *." *Wilson* at ¶ 18. We dismiss Johnson's fourth assignment of error as moot.

### B. First Assignment of Error — Sufficiency of the Evidence

{¶ 115} Johnson contends that the state did not present sufficient evidence with respect to any count for which the trial court found her guilty and she says the trial court should, therefore, have granted her Crim.R. 29(A) motion for acquittal on each count.

{¶ 116} While Johnson challenges every count for which the trial court found her guilty, any error with respect to the sufficiency of the evidence on the voluntary-manslaughter and reckless-homicide counts is harmless because those counts will be merged into the sentence imposed for involuntary manslaughter on resentencing. *See State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14 ("When counts in an indictment are allied offenses, and there is sufficient evidence to

support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless * * *."), citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990).

{¶ 117} Therefore, in addressing this assignment of error, we consider only whether sufficient evidence was presented to support a conviction for involuntary manslaughter, which involves a consideration of the sufficiency of the evidence related to the aggravated-assault offense.

{¶ 118} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Crim.R. 29(A) mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. Crim.R. 29(A) (the trial court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses"); *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21. Accordingly, we apply the same standard of review to a trial court's denial of a defendant's motion for acquittal as we use when reviewing sufficiency of the evidence. *Taylor* at ¶ 22–23 ("Crim.R. 29(A) and sufficiency of the evidence review require the same analysis."), citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571.

{¶ 119} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at

trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 120} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime."). We must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 121} The elements of an offense may be proven by direct evidence, circumstantial evidence or both. *See, e.g.*, *State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 25, citing *State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw

an inference from the evidence to the proposition that it is offered to establish.'" *Wells* at ¶ 25, quoting *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence is "evidence that requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Wells* at ¶ 25, quoting *Cassano* at ¶ 13; *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[C]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind."). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.

{¶ 122} A person commits involuntary manslaughter when they "cause the death of another * * * as a proximate result of * * * committing or attempting to commit a felony." R.C. 2903.04(A)(1). Here, there is no dispute about whether Johnson caused Smith's death; she did. The dispute centers on whether Johnson killed him as a proximate result of committing a felony. Here, we consider whether Johnson killed Smith as a proximate result of committing aggravated assault.

{¶ 123} A person commits aggravated assault when they "knowingly * * * [c]ause serious physical harm to another * * *" "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.12(A)(1). A person acts knowingly when "the person is aware that the person's conduct will probably cause a certain result

* * *." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.*

{¶ 124} "Voluntary intoxication [including intoxication resulting from the ingestion of alcohol] may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." R.C. 2901.22(E), (F)(4). But "[r]eflexes, convulsions * * * and body movements that are not otherwise a product of the actor's volition[] are involuntary acts" that may negate criminal liability. R.C. 2901.21(A)(1), (F)(2).

{¶ 125} Johnson's argument about each count of conviction is the same — "[b]ecause the shooting was an accident, the State failed to prove that Ms. Johnson acted purposefully or knowingly or recklessly." She also says the evidence was insufficient to convince a reasonable factfinder beyond a reasonable doubt that she was under the influence of a sudden passion or in a sudden fit of rage when she killed Smith.

{¶ 126} An accident is an event that occurs "unintentionally and without any design or purpose to bring it about." *State v. Fears*, 86 Ohio St.3d 329, 340, 715 N.E.2d 136 (1999).

{¶ 127} Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence that Johnson, during an argument, pulled the trigger of a handgun while holding it pointed at Smith, within inches of his chest. Johnson repeatedly admitted that she pulled the trigger of the handgun and the firearms expert testified that the gun could not have fired without the trigger being pulled.

Forensic tests showed that the muzzle of the gun was less than nine inches from Smith's chest when Johnson pulled the trigger.

{¶ 128} A neighbor testified that he heard an argument before the shooting. T.J. and Ti.J. corroborated that their parents had been arguing before the shooting with T.J. testifying that they had been arguing about past relationships. While T.J. testified at trial that several minutes passed between when she heard the argument and the shooting, this testimony is not consistent with the neighbor's testimony that "[w]hen they were arguing that's when I heard the gunshot." Despite multiple reports of an argument, Johnson repeatedly denied to investigators that she and Smith had been arguing before he was shot. In at least one interview, Johnson told police that Smith pulled out the gun and handed it to her while they were "having a conversation" and "said yeah, something something, you're not going to do something something, and I pulled the trigger."

{¶ 129} There was sufficient evidence for a reasonable factfinder to conclude, beyond a reasonable doubt, that the shooting was not a mere accident and that Johnson caused Smith's death while committing aggravated assault. The evidence was also sufficient to support the one- and three-year firearm specifications attached the involuntary-manslaughter count, because there is no dispute that Johnson had a firearm under her control and displayed it and used it to facilitate the offense. R.C. 2941.141(A), 2941.145(A). We, therefore, overrule Johnson's first assignment of error.

## C. Second Assignment of Error — Manifest Weight of the Evidence

{¶ 130} Johnson contends that her convictions were against the manifest weight of the evidence. As with our review for sufficiency, we only consider whether the trial court's finding of guilt as to involuntary manslaughter was against the manifest weight of the evidence. *See Powell*, 49 Ohio St.3d at 263, 552 N.E.2d 191.

{¶ 131} A manifest-weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.

{¶ 132} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree with "the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witness' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). In conducting this review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10

Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraphs one and two of the syllabus. Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 133} Johnson contends that the manifest weight of the evidence shows that the shooting was an accident and that she lacked any culpable mental state. She points out that Johnson immediately called 911 after the shooting for emergency help, pleaded with emergency responders to save Smith's life and repeatedly told police and others that she shot Smith by accident. She related that she told police that she did not believe the gun was loaded. She relies on J.T.'s trial testimony that there was a period of minutes between when she heard her parents "talking loudly" and the shooting. Ti.J.'s testimony can be understood to corroborate portions of T.J.'s recollection of the events immediately preceding the shooting.

{¶ 134} Only two people were present in the room when Smith was killed— they were both intoxicated. Johnson reported having trouble remembering the circumstances of the shooting in the hours after the shooting because they had been drinking. While Johnson told police that she had seen guns before, T.J. testified that she never saw Johnson handle or fire a gun. Unintended shootings are all-too-common when firearms are handled recklessly or negligently — *see, e.g., State v. Howse*, 2012-Ohio-6106, 985 N.E.2d 246, ¶ 29 (9th Dist.) (reckless homicide where defendant cocked a loaded handgun and pointed it at the victim while the two argued); *State v. Erby*, 2d Dist. Montgomery No. 27799, 2018-Ohio-3695, ¶ 22–24

(reckless homicide where defendant waved a loaded gun within two feet of the victim with his finger on the trigger) — especially when alcohol is involved. *See State v. Gough*, 5th Dist. Licking No. 08-CA-55, 2009-Ohio-322, ¶ 4, 6, 11 (reckless homicide where defendant shot the victim in the head while playing with the victim's gun during a party at which the defendant was drinking). "[I]ntoxicated persons may believe a gun is unloaded when, in fact, it is not, which can lead to unintended shootings. Tragically, this is confirmed by news reports of accidental shootings in which the shooter later states that he or she thought the gun was unloaded." *State v. Weber*, 163 Ohio St.3d 125, 2020-Ohio-6832, 168 N.E.3d 468, ¶ 43, 46 (discussing potential reasons why R.C. 2923.15 applies to unloaded firearms and citing consistent advice from gun manufacturers that it is unsafe to handle a gun while intoxicated). Furthermore, the detective in this case admitted that it is possible for a person to pull the trigger of a gun accidentally. And there is no denying that Johnson appears incredibly distraught in the body-camera recordings entered into evidence in this case.

{¶ 135} In looking at the record as a whole, we cannot say that Johnson's involuntary-manslaughter conviction was against the manifest weight of the evidence. As discussed above at paragraphs 127–128, an independent witness testified that he heard the shooting take place during an argument — an argument that was loud enough for him to hear from a nearby apartment. That there was an argument was corroborated by T.J. Ti.J., while very young, also remembered that Johnson "got mad" at Smith that night because Smith was "acting silly" and "talking

bull crap" to her. Johnson, on the other hand, consistently denied that there had been any argument before the shooting. Moreover, the detailed story Johnson told CCDCFS sometime later about the circumstances of the shooting contradicted what she told investigators in the hours following the shooting. While T.J.'s trial testimony contradicted the neighbor's with respect to whether there was a "cooling-off" period between the argument and the shooting, "[a] conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony." *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38.

{¶ 136} The forensic evidence put, at most, nine inches between the muzzle of the gun and Smith's chest when Johnson pulled the trigger. While Johnson told police that she did not believe the gun was loaded, she had no reason to believe it was not loaded. *Compare State v. Leannais*, 8th Dist. Cuyahoga No. 107167, 2019-Ohio-2568, ¶ 42–43 (E.A. Gallagher, J., dissenting) (defendant personally unloaded the handgun in a way to clear it of all live rounds and knew there was no magazine in it when he pulled the trigger later in the evening, killing someone because the chamber had been reloaded by others at some point after the defendant had unloaded it). Indeed, the fact that she told investigators it was her practice to require the gun be stowed high off the ground in a closet suggests that she knew Smith routinely brought it into her home when it was loaded.

{¶ 137} Johnson argued her defense to the trial court and the court was free to reject any portion of the state's evidence or witness testimony that was

inconsistent or otherwise unbelievable. The court's acquittal on the purposeful-murder charge and the findings of guilt on lesser-included offenses with respect to other charges show that the trial court did not accept the state's theory of the case wholesale. But the transcript shows that the trial court was persuaded by the testimony of Johnson's neighbor who heard the shooting happen amid the midst of the argument.

{¶ 138} After a thorough review of the record, and after considering Johnson's appellate arguments, we cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice such that a conviction must be reversed.

{¶ 139} We, therefore, overrule Johnson's second assignment of error.

### D. Third Assignment of Error — Witness Competency and Ineffective Assistance of Counsel

#### 1. Competency of Ti.J. as a Witness

{¶ 140} Johnson contends that her six-year-old daughter Ti.J. was not competent to testify as a witness.

{¶ 141} Evid.R. 601 governs the competency of witnesses and provides that "[e]very person is competent to be a witness except as otherwise provided in these rules." In relevant part, a person is disqualified from testifying if he or she is "[i]ncapable of expressing himself or herself concerning the matter as to be understood" or "[i]ncapable of understanding the duty of a witness to tell the truth." Evid.R. 601(B)(1)–(2).

{¶ 142} Johnson argues that Ti.J. should have been disqualified to testify as a witness because "her ability to receive accurate impressions of fact or to observe acts about which she would testify were minimal" and she "was unable to properly identify the month of Christmas and did not even know who her teachers were at the time she was testifying."

{¶ 143} Johnson acknowledges that she did not object to Ti.J.'s competency at trial. Accordingly, she has forfeited all but plain error. *See* e.*g*., *State v. Ford*, 11th Dist. Trumbull No. 2020-T-0001, 2020-Ohio-4634, ¶ 57.

{¶ 144} Appellate courts have discretion to correct plain errors, i.e., "'a deviation from a legal rule' that constitutes 'an "obvious" defect in the trial proceedings,'" that has affected a substantial right, i.e., that "'affected the outcome of the trial.'" *Rogers* at ¶ 22–23, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); Crim.R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Thus, reversal for plain error requires a showing that there was an error, that the error was plain or obvious, that the error affected the outcome of the proceeding and that reversal is necessary to correct a manifest miscarriage of justice. *State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, 164 N.E.3d 294, ¶ 7, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. The party

asserting plain error "bears the burden of proof to demonstrate plain error on the record." *Rogers* at ¶ 22, citing *Quarterman* at ¶ 16.

{¶ 145} We reject Johnson's argument because we are convinced that any error in allowing Ti.J. to testify — if there was any error — did not affect the outcome of Johnson's trial. It is true that Ti.J. testified that her parents had been arguing on the night of the shooting, which corroborated T.J.'s and Greenwood's recollection and contradicted Johnson's denial to law enforcement that they had been arguing. But Ti.J.'s testimony otherwise supported Johnson's defense. Ti.J. testified that she remembered someone spilling liquid on the couch and T.J. helping to clean up the spill, corroborating T.J.'s recollection of events (which the state had tried to impeach). And when the state asked Ti.J. when she heard the gunshot "in comparison to the argument," Ti.J. answered "five minutes." This could be understood to corroborate T.J.'s recollection that several minutes passed between when her parents were arguing and when the gun discharged. Furthermore, the trial court, in announcing its verdicts, stated that it was persuaded by Greenwood's testimony.

{¶ 146} Therefore, we need not consider whether allowing Ti.J.'s testimony was error because any error that may exist would not be plain error that we would notice.

### 2. Ineffective Assistance of Counsel

{¶ 147} Johnson contends that her trial counsel was ineffective for not objecting to the trial court's finding that Ti.J. was competent to testify.

{¶ 148} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Id.*

{¶ 149} In evaluating counsel's performance on a claim of ineffective assistance of counsel, the court must give great deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see also State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

{¶ 150} As a general matter, defense counsel's tactical decisions and trial strategies — even "debatable" ones — do not constitute ineffective assistance of counsel. *See, e.g., State v. Black*, 8th Dist. Cuyahoga No. 108001, 2019-Ohio-4977, ¶ 35; *State v. Foster*, 8th Dist. Cuyahoga No. 93391, 2010-Ohio-3186, ¶ 23; *see also State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, 111. Reviewing courts "will ordinarily refrain from second-guessing strategic decisions counsel make at trial," even where trial counsel's strategy was "questionable" and even where appellate counsel argues that they would have defended against the

charges differently. *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 152; *State v. Mason*, 82 Ohio St.3d 144, 169, 694 N.E.2d 932 (1998); *State v. Quinones*, 8th Dist. Cuyahoga No. 100928, 2014-Ohio-5544, ¶ 25.

{¶ 151} Failing to object to Ti.J.'s competency was not ineffective assistance of counsel. As discussed above, part of Ti.J.'s testimony supported the state's theory of the case but her testimony also undercut significant aspects of that theory, including by corroborating aspects of T.J.'s recollection of the events immediately preceding the shooting. We cannot say that the verdicts would have been different had Ti.J. not testified, let alone that any difference would have benefitted Johnson.

{¶ 152} We, therefore, overrule Johnson's third assignment of error.

### III. Conclusion

{¶ 153} Having sustained Johnson's fifth assignment of error, in part, based on a conceded error, we reverse the judgment, in part. Specifically, we vacate the trial court's sentence on the voluntary-manslaughter charge and remand this matter for resentencing on the charge the state selected for sentencing: involuntary manslaughter. On remand, we direct the trial court to accept the state's selection of involuntary manslaughter, merge the offenses accordingly for the purposes of sentencing and impose a sentence that is appropriate for involuntary manslaughter.

{¶ 154} We disregard Johnson's fourth assignment of error as moot.

{¶ 155} Having overruled Johnson's first, second and third assignments of error for the reasons stated above, we affirm the judgment in all other respects. The trial court's guilty verdict on the involuntary-manslaughter charge was supported by

sufficient evidence and was not against the manifest weight of the evidence.  There was no ineffective assistance of counsel and there was no plain error in the trial court's qualifying Ti.J. as a competent witness.  The guilty verdicts underlying Johnson's sentences remain the law of the case and are not subject to review on remand.

{¶ 156} Judgment affirmed in part, reversed in part and remanded.

It is ordered that the appellant recover from the appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EMANUELLA D. GROVES, J., CONCUR